STATE OF MISSOURI, at the Relation of the CITY OF ST. LOUIS, a Municipal Corporation, Relator-Appellant, v. PUBLIC SERVICE COMMISSION OF MISSOURI, and MORRIS E. OSBURN, KYLE D. WILLIAMS, JOHN P. RANDOLPH, CHARLES L. HENSON and E. L. McCLINTOCK, as Members of Said PUBLIC SERVICE COMMISSION, and ST. LOUIS COUNTY WATER COMPANY, a Corporation, Respondents.

STATE OF MISSOURI, at the Relation of the CITY OF UNIVERSITY CITY, CITY OF RICHMOND HEIGHTS, CITY OF CLAYTON, CITY OF OVERLAND, CITY OF BERKELEY and CITY OF BEVERLY HILLS, Relators-Appellants, v. PUBLIC SERVICE COMMISSION OF MISSOURI, and MORRIS E. OSBURN, KYLE D. WILLIAMS, JOHN P. RANDOLPH, CHARLES L. HENSON and E. L. McCLINTOCK, as Members of Said PUBLIC SERVICE COMMISSION, and ST. LOUIS COUNTY WATER COMPANY, a Corporation, Respondents, No. 42423—245 S. W. (2d) 851.

Division Two, January 14, 1952.

Motion for Rehearing or to Transfer to Banc Overruled, February 11, 1952.

978

*Marvin E. Boisseau, L. A. Robertson, Glen Mohler, Robert I. Neumann, James E. Crowe* and *Forrest G. Ferris, Jr.,* for appellants City of University City, City of Richmond Heights, City of Berkeley, City of Beverly Hills, City of Clayton and City of St. Louis.

*Tyre W. Burton* for respondents Public Service Commission of Missouri et al., and *Emmet T. Carter* and *Gerald K. Presberg* for respondent St. Louis Water Company.

*David M. Proctor,* City Counselor, and *Jerome M. Joffee,* Special Utilities and Legislative Counsel, amicus curiae.

980

BARRETT, C.—The St. Louis County Water Company is a privately owned public utility engaged in the business of supplying water and fire hydrant service, with four exceptions, to the residents of the sixty-six incorporated and the numerous unincorporated areas of St. Louis County. The company had two "meter rates," known as A and B, which had been in force for thirteen years and two "flat rates," known as C and D, which had been in effect for twenty-five years and a special rate for manufacturers and large consumers. The company's property had been valued, its rates fixed and its fair return determined upon a "system wide" basis. Beginning in 1941 sixteen of the sixty-six incorporated areas in the company's

system have levied special taxes upon the gross receipts of the company. The taxes range from two to five per cent of the gross receipts in fifteen of the areas to a flat annual charge of $1300 in the City of Maplewood. The company was of the view that the taxes levied in the sixteen areas resulted in a discrimination in rates against consumers residing in the unincorporated areas and in the incorporated areas that did not levy the tax or that had no power to levy the tax, and the company proposed, by this proceeding which originated in the Public Service Commission, to correct the resulting inequities between consumers.

In order to accomplish its purpose of eliminating any discrimination resulting from the taxes, the company, in 1948, filed with the Public Service Commission new schedules of rates which canceled its former approved rate schedules. In the new schedules the former basic rates were not changed but in all the cities in which a gross receipts tax was levied and in which the company did not have a franchise or fire hydrant contract, the company "allocated" or added to the water consumer's bill the amount of the tax. In the cities in which the company had a franchise and fire rental contract the company proposed to absorb two per cent of the tax and add any sum in excess of two per cent to the consumer's bill. All interested municipalities were permitted to intervene and the proceeding was heard with reference to the taxes for the year 1949 in the total sum of $31,305.

The commission found that it was "an unjust discrimination for the water consumers of one area to be burdened with any part of the taxes levied or payments exacted by another area," and "that the consumers in any and all municipalities which seek to obtain revenue from such taxes or payments should bear the burden of providing such revenue." The commission, however, was of the view that the fact of a franchise in certain of the cities was immaterial and that the entire tax "whether in the nature of license taxes, occupational taxes, street rentals, franchise payments or any other similar or kindred tax, should be paid by the water consumers residing in the municipality which receive such taxes or payments." The commission was also of the view that "The allocation of such costs should be accomplished by and reflected in the rates themselves rather than by adding to each individual consumer's bill as a separate item thereof." Accordingly the commission, denied the schedules filed by the water company and ordered for the commission's consideration the filing of new schedules of rates and charges but adding to the rate and passing on to the users of water service the amount of any such tax the company paid to the city in which the customer resided. The new schedules were filed and approved by the commission. Upon certiorari the Circuit Court of Cole County found the issues for the Public Service Commission, and the cities of

Richmond Heights, University City, Clayton, Overland, Berkeley and Beverly Hills appeal from that judgment.

■ Some "other provision for judicial review is provided" (Mo. R. S. 1949, Sec. 536.100) by the laws relating to proceedings before the Public Service Commission and those laws rather than the Administrative Procedure Act determine the scope of our review. Scott v. Wheelock Bros., Inc., 357 Mo. 480, 482, 209 S. W. (2) 149, 150. Compare: State ex rel. Dail v. Public Service Com., 240 Mo. App. 250, 203 S. W. (2) 491. The question reviewable upon this appeal is whether the decision and order of the commission is reasonable and lawful, or, conversely, whether the order is arbitrary and without reasonable basis. State ex rel. City of St. Louis v. Public Service Com., 329 Mo. 918, 47 S. W. (2) 102; State ex rel. Alton Transp. Co. v. Public Service Com., 330 Mo. 1, 49 S. W. (2) 614.

■ In determining this question it is necessary to carefully note the precise issues involved. There is no complaint here by a water user or water rate payer or by any municipality that the taxes levied by the sixteen cities result in an unjust discrimination in rates against them. The water company alone alleges that the taxes result in an inequality and proposes on its initiative alone to correct the abuse, and its adversaries, challenging the proceedings, are the cities levying the tax. There is no claim here on the part of the company of confiscation or that the present rates are too low or that the taxes have impaired its fair earnings. There is no request here for a revaluation of all or any part of the company's property and the establishment of a new and different rate base. The sole purpose of this proceeding, from the company's standpoint, is to adjust the inequalities resulting from the taxes by passing them on to water consumers and rate payers irrespective of any other question or factor.

It may have been possible for the company to have operated, or for the commission to have segregated and classified the cities and towns and treated them, on a unit basis for rate making purposes and fair return (State ex rel. City of Harrisonville v. Public Service Commission, 291 Mo. 432, 236 S. W. 852; Re Missouri Power & Light Co., (Mo.) P. U. R. 1925D, p. 293; Public Service Com. v. Missouri Power & Light Co., 10 P. U. R. (N. S.) 8; Annotations 4 A. L. R. (2) 595) but, as we have said, the company is organized and operates on an integrated, system wide basis. All its properties in the entire area, practically all of St. Louis County, irrespective of the conglomerate political subdivisions in its system, have been valued and both rates and the company's right to a fair return have been determined upon that basis. All taxes, including taxes on gross receipts, are a part of operating expense (43 Am. Jur., Secs. 141, 143, pp. 665, 667; 73 C. J. S., Sec. 25, p. 1042) and, no doubt, were and may be taken into consideration by the company and the

commission when it becomes necessary to determine or redetermine rates and a fair return. Some of the arguments in favor of the system wide basis of utility operation, as opposed to the municipality or segregated district as a unit of operation, are that it avoids complexity, is characterized "by common source of supply, community interest, service unity, operating unity," and permits the extension of service into sparsely settled communities unable to support their own utilities. 32·Mich. L. R. 289. But regardless of the respective merits of the two methods of operation, the company operates on the system wide basis and the commission has heretofore approved its rates and return on that basis and both are now in the anomalous position of disregarding the system basis and of treating this one item of operating expense upon a segregated, municipal unit basis. An exponent of the system basis of operation has said, "Where the utility seeks relief as to its entire rate structure but shows a failure to earn a fair return from part of its rate structure, the facts do not support the relief sought, and the utility must fail." 32 Mich. L. R., l. c. 318.

Does the imposition of the taxes by the cities in this case result as a matter of fact in a discrimination in rates, and if so how great and unjust is the discrimination? Assuming that some inequality and discrimination results from the taxes, does the company's proposal and the commission's order in this proceeding fairly adjust or eliminate the inequality? Three jurisdictions have answered the first question affirmatively, even though the utilities were operating on a system wide basis, and have said, therefore, that the taxes levied by a city within the system should be reflected in the rates charged within that community. But all they have said, in analyzing the problem, is "Manifestly there is an element of unjust discrimination in allowing one community to levy and collect from respondent or any public utility engaged in business throughout the state an occupation tax which in turn the utility would collect by a statewide increase in rates." State ex rel. Pac. T. & T. Co. v. Dept. Pub. Serv., 19 Wash. (2) 200, 277, 142 P. (2) 498; 33 Wash. (2) 896, 207 P. (2) 712. And they have said that the imposition of these charges, municipal taxes, "to the company's general operating expense would result in an unjust burden on the customer residing outside of such municipalities." Re Consumers Power Co., (Mich.) 14 P. U. R. (N. S.) 36, 41. See also City of Elmhurst v. Western United G. & E. Co., 363 Ill. 144, 1 N. E. (2) 489; Re Southern Bell T. & T. Co., (N. C.) 7 P. U. R. (N. S.) 21. However in all these cases there was a complete valuation of all the companies' properties and a complete determination of rates and fair return.

But aside from the fact that the method proposed here ignores the theory and practice of rate making and utility operation upon a system wide basis, further analysis demonstrates that the discrimina-

tion is not so great as would appear upon the surface. In this proceeding the company, in attempting to prove the disparity, has submitted charts showing the gross revenue per customer received by the company for the calendar year 1947 and from this data has ranked the cities levying the tax. It has submitted charts ranking the tax levying cities by gross revenue per mile, and charts comparing the tax levying areas with respect to revenue received from such areas as compared to the special taxes paid. The commission found that the gross revenue received in 1947 from twenty-four cities served by the company amounted to $1,008,802.00 and that seventy-four and five tenths per cent of that sum was received from fifteen cities which have exercised their license taxing power and that twenty-four and five tenths of that sum was received from the remaining nine cities which have not levied license taxes. But again this calculation singles out twenty-four of the cities from the sixty-six served, as well as from the numerous unincorporated areas. Furthermore, there were no charts showing total gross receipts, or net income, or any demonstration by precise figures that there was any impairment of the company's fair return in the areas levying the tax.

But irrespective of all this, the disparity or discrimination is certainly not the total sum of the taxes levied. As indicated, an integrated system with uniformly lower rates for the entire system may be preferable to lower rates for segregated towns or areas more favorably located with respect to service. Re Commonwealth Water Co., (N. J.) P. U. R. 1922C, p. 48; Ben Avon Borough v. Ohio Valley Water Co., (Pa.) P. U. R. 1917C, p. 390; Re Wisconsin Tel. Co., P. U. R. 1931E, p. 135. "Therefore, ▬ the burden of cost of service of water as a whole to all water consumers has been distributed as equitably as may be upon each class of service, regardless of the locality in which such service is given." Glenview Improvement Club v. People's Water Co., (Cal.) P. U. R. 1918F, p. 187. The order and the company's position in this proceeding erroneously presuppose that there was no discrimination in the former uniform rates in the first place and, of course, that assumption is without foundation. The water company serves, for practical purposes, the entire area of St. Louis County. It certainly costs the company less to serve some areas than it does others, and necessarily there is a corresponding discrimination inherent in uniform rates throughout the system. In the areas that are less costly to serve there is undoubtedly a greater profit to the company than in the more costly areas and that results in a discrimination in rates in favor of the costly areas. If any of the municipalities levying the tax are in the less costly areas, the addition of the tax to their water rates obviously increases the burden of the discrimination. There is no data in this record from which precise information may be obtained, but for the most part the cities levying the tax are the greatest in density of population and contribute the greater sums

to both the company's gross and net revenue. Those areas in which the company has a franchise or valuable contract rights certainly make the greater contribution to the company's stability and successful operation. From an operational standpoint they are in a more favorable position for rate making purposes than some isolated, unincorporated area, or some other more costly area, and yet uniform system wide rates ignore these disparities. In short there is disparity in the former uniform system wide rates and the discrimination is favorable, undoubtedly, to the more costly areas, and the taxes involved in this proceeding may or may not shift that unfavorable disparity; from all that appears in this record the taxes may have equalized the previously existing inequalities. But if it does, it does not necessarily follow that the amount of the resulting difference is precisely the amount of the tax, or that it exceeds the more favorable rate previously enjoyed by the more costly operational areas or, in short, that the discrimination is unfair and unjust.

There is no reasonable basis upon this record for the commission's finding and order; accordingly the judgment is reversed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. All the judges concur.