IN RE TELEPHONE CHARGES OF THE UNITED TELEPHONE COMPANY OF THE WEST IN THE CITY OF SCOTTSBLUFF, NEBRASKA.
CITY OF SCOTTSBLUFF, A MUNICIPAL CORPORATION, APPELLANT, V. UNITED TELEPHONE COMPANY OF THE WEST, A CORPORATION, APPELLEE, NORTHWESTERN BELL TELEPHONE COMPANY ET AL., INTERVENERS-APPELLEES, IMPLEADED WITH STATE OF NEBRASKA, APPELLEE.

106 N. W. 2d 12

Filed November 18, 1960. No. 34792.

*Loren G. Olsson* and *Nelson, Harding & Acklie,* for appellant.

*Wright & Simmons* and *James R. Hancock,* for appellee United Telephone Co. of the West.

*Bert L. Overcash, Edward Sklenicka,* and *Gerald J. Hallstead, for* interveners-appellees.

*Clarence S. Beck,* Attorney General, and *Homer G. Hamilton,* for appellee State of Nebraska.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

On September 30, 1959, the City of Scottsbluff, herein called plaintiff, filed a complaint, No. 935, with the Nebraska State Railway Commission, herein called commission, seeking as a municipal corporation and as a subscriber on behalf of all other subscribers within said city, to have set aside and vacated orders of the commission entered January 26, 1959, and April 21, 1959, which authorized United Telephone Company of the

West, herein called defendant, to amend and revise its general rules and regulations applying to telephone service and tariffs and approve same to provide that: "* * * when any city or village served by applicant imposes upon applicant an occupation tax, license tax, permit fee or franchise fee, such tax or fee shall be billed annually pro rata by the Company to the exchange customers receiving service within the territorial limits of such municipal corporation." Only an occupation tax imposed by plaintiff was or is directly involved.

The grounds for plaintiff's complaint were substantially that no notice was given of hearing held by the commission on defendant's applications filed December 30, 1958, and April 10, 1959, of which plaintiff allegedly had no notice or knowledge until April 25, 1959; that the commission was without jurisdiction to enter its orders of January 26, 1959, and April 21, 1959; that such orders were void and defendant was without authority to so bill the occupation tax to its subscribers within the territorial limits of plaintiff city or charge them in excess of the rates theretofore fixed by the commission on August 8, 1958; and that such pro rata charge to subscribers resulted in an unreasonable service rate and a rate unjustly discriminatory against subscribers located within plaintiff city.

Notice of hearing on plaintiff's complaint having been given, defendant filed a voluminous answer on October 14, 1959, traversing generally the material allegations of plaintiff's complaint and denying that plaintiff had such an interest as would give it a right to maintain the action. Certain admissions were made in defendant's answer which need no recitation at this point in the opinion.

On October 19, 1959, the Nebraska Telephone Association filed an application for leave to intervene, together with a showing in support thereof, for the purpose of opposing plaintiff's complaint. A hearing was held by the commission on the issues thus joined on

October 26, 1959, and November 5, 1959, whereat counsel for the city of Crete appeared as intervener in oral support of plaintiff's complaint. Counsel for Northwestern Bell Telephone Company also appeared as intervener in oral opposition to plaintiff's complaint, and an assistant attorney general appeared only in an advisory capacity for the commission.

Thereafter, the commission entered an opinion, findings, and order dismissing plaintiff's complaint and thereafter overruled plaintiff's motion for rehearing. Therefrom plaintiff appealed to this court, assigning substantially that: (1) The commission erred in dismissing plaintiff's complaint and overruling its motion for rehearing; (2) that the commission's orders entered January 26, 1959, and April 21, 1959, were void for failure to comply with sections 84-901 to 84-908, R. R. S. 1943; and (3) that the decision of the commission was contrary to the evidence and law. We do not sustain the assignments.

The material facts involved are not in dispute, and the questions presented by the pleadings and evidence are: (1) Did the plaintiff as a municipal corporation and a subscriber of telephone service from defendant and on behalf of all other such subscribers within the limits of the city have a right to maintain the action; (2) were the orders here involved rules and regulations within the provisions of sections 84-901 to 84-908, R. R. S. 1943; (3) did the commission have the power and authority to enter an order or orders permitting defendant to amend and revise its general rules and regulations and thereby impose pro rata against its subscribers within plaintiff city an occupation tax levied by it; and (4) were such orders unreasonable and arbitrary or discriminatory.

Plaintiff is a municipal corporation organized under the laws of Nebraska and a city of the first class, having a population of about 14,000. Defendant has a franchise from the city which did not require payment of any

franchise fee. On May 1, 1959, defendant's main office was located in plaintiff city and there were 4,438 telephone stations of defendant located within the city, not including stations subscribed by the United States, the state, and agencies or political subdivisions of either. Also, on May 1, 1959, defendant owned and maintained local service exchanges in the cities or villages of Scottsbluff, Gering, Bayard, Mitchell, Morrill, Lyman, Minatare, Broadwater, Oshkosh, Lewellen, and Chappell, in Nebraska, and in addition thereto owned and maintained telephone stations located within rural areas in Scotts Bluff, Banner, Morrill, Garden, Deuel, and Sioux counties. The total number of telephone stations served by defendant in Nebraska on May 1, 1959, including those within plaintiff city but not including stations subscribed by the United States, the state, or agencies or political subdivisions thereof, was 11,399.

On April 21, 1958, defendant filed an application, No. 21298, with the commission, seeking authority to increase rates and charges for telephone service furnished by it within Nebraska. On August 6, 1958, after a hearing whereat plaintiff city participated as a protestant, an order was entered by the commission which granted such application, in part overruled objections thereto, and ordered defendant to submit for the commission's approval a schedule of rates and charges for telephone service in Nebraska that would produce the additional revenue allowed.

On August 8, 1958, in application No. 21298, the commission approved defendant's attached schedule of increased intrastate rates and classification of exchanges, and authorized defendant to charge for and collect such schedule of rates effective as of August 11, 1958. Such orders became final without appeal therefrom.

On December 30, 1958, defendant filed an application, No. 21629, with the commission, referring therein to its application, No. 21298, and the commission's order of August 8, 1958, authorizing defendant's schedule of rates

and charges, and proposing "to revise its general rules and regulations to provide that when a city or village of a rate group imposes upon the telephone company an occupation tax, license tax, permit fee or franchise fee, such tax or fee shall be billed pro rata to the exchange customers receiving service within the territorial limits of such municipal corporation, annually." Defendant's prayer was all inclusive and for exactly that relief, with no exception for any such subscribers.

Thereafter, on January 6, 1959, a letter from the commission addressed: "TO ALL PERSONS INTERESTED:" was received by plaintiff city, directing its attention to an attached letter dated December 23, 1958, which pertained "to occupation tax levied against telephone companies operating in the State of Nebraska." Such attached letter, signed by an assistant attorney general and received by the commission, said in part: "It appears that the city of Scottsbluff has imposed an occupation tax on this company, which in turn has asked permission of the Commission to pass the tax on to only the telephone subscribers located in the city of Scottsbluff, in the form of increased rates." The substance of the opinion so given by the assistant attorney general in his letter of December 23, 1958, was that the occupation tax was "only another general expense and in the same category as other taxes and it can be considered only as a part of the general structure used to determine a fair rate of return and that the impact of such tax cannot be shifted to any particular locality." Such conclusion was reached by analogy without citing any authority.

On January 26, 1959, a letter from the commission addressed: "TO ALL PERSONS INTERESTED:" was received by plaintiff city. It called attention to the commission's letter of January 6, 1959, and the letter of December 23, 1958, attached thereto, then pointed out that on January 13, 1959, the commission had received another letter from the assistant attorney general which

stated that the letter of December 23, 1958, was erroneous and that his attached letter of January 13, 1959, was to correct that error. Such letter cited many authorities, and concluded that: "The authorities hold generally that it is proper, where an occupation tax or license is levied by municipalities, to pro rate such tax or fee among the subscribers in the municipality which imposes such taxes or fees. The decisions are based on the principle that if such items of expense are assessed to all the subscribers, those who live outside the territorial limits of the municipality imposing the tax pay a share of the tax of those who receive the benefit of the tax imposed and that this results in discrimination against the nonresident subscribers."

In the meantime, on January 26, 1959, plaintiff enacted an ordinance imposing an occupation tax of $3,600 upon telephone companies maintaining an office and doing an intrastate business within the limits of the city on May 1 of any year, which tax was due and payable in advance on May 1 of each year. Also, on January 26, 1959, and evidently prior to enactment of the aforesaid ordinance, the commission, without further notice to plaintiff, granted defendant's application No. 21629 theretofore filed by it December 30; 1958. It did so: "Upon consideration of the application and attending circumstances, and being fully advised, the Commission is of the opinion and finds that the application is fair and reasonable, is in the public interest and should be granted." The order of the commission was that defendant "be and it is hereby authorized to revise its general rules and regulations applying to telephone service as set forth in the opinion and findings and by this reference made a part hereof," to wit "to provide that when a city or village imposes upon the telephone company an occupation tax, license tax, permit fee or franchise fee, such tax or fee shall be billed prorata to the exchange customers receiving service within the territorial limits of such municipal corpora-

tion." This conformed to defendant's application No. 21629.

Also, on April 10, 1959, defendant filed application No. 21737 with the commission seeking approval of its "General Rules and Regulations applying to telephone service," a copy of which was attached to defendant's application. In that connection, without further notice to plaintiff city, an opinion, findings, and order were entered by the commission on April 21, 1959, finding that defendant's general rules and regulations were "in substance a recodification of the General Rules and Regulations applying to telephone service of applicant, now on file with the Commission and heretofore approved by it although not issued all in one instrument, together with a provision made in the General Rules and Regulations in compliance with the order of this Commission on January 26, 1959, in application No. 21629." The order of April 21, 1959, authorized defendant "to issue General Rules and Regulations applying to telephone service, a copy of which is attached to the application." As far as important here, such rules and regulations provided that: "When any city or village imposes upon the Telephone Company an occupation tax, license tax, permit fee or franchise fee, such tax or fee shall, insofar as practicable, be billed prorata to the exchange customers receiving service within the territorial limits of such municipal corporation."

Thereafter, on April 27, 1959, the occupation tax of $3,600 imposed upon defendant by plaintiff, commencing May 1, 1959, was paid to the city by defendant and same was accepted by plaintiff. Upon billing subscribers for services beginning in the month of May, defendant added 80 cents to the statements of each of the 4,438 subscribers using telephone service within the city, which sum was separately designated as the subscriber's pro rata share of the occupation tax for 1959 assessed to defendant telephone company.

True, such charge was not billed by defendant to plaintiff city as a subscriber for its telephone services, but it will be noted that defendant's applications, Nos. 21629 and 21737, the orders of the commission in response thereto, and defendant's general rules and regulations duly filed with and approved by the commission, covered all "exchange customers receiving service within the territorial limits of such municipal corporation," which included plaintiff as a subscriber therein. Whether plaintiff was billed as a subscriber or not is of little importance here. It may have been good business policy for the company not to bill the city as a subscriber but the controlling question is not what was done but what could have been done under the authority sought by defendant and granted by the commission. In other words, the city was a subscriber having the same interest as any other subscriber who had a right to maintain this action. Whether the commission could have excepted the city as a subscriber is not an issue here. The fact is that it did not do so and that defendant did not even request it. Contrary to defendant's contention, the opinion in In re Application of Nebraska Power Co., 147 Neb. 324, 23 N. W. 2d 312, does not foreclose plaintiff's right to maintain this action and appeal to this court. In that connection, section 75-401, R. R. S. 1943, specifically provides in part that: "When any * * * person in his own behalf or in behalf of any class of persons similarly situated, * * * or any body politic or municipal organization, shall make complaint to the State Railway Commission that any rate or rates fixed by the commission in the schedule mentioned in section 75-302, or in any subsequent revised or modified schedule, * * * is unreasonably high or low, unjust or discriminating, the commission shall immediately fix a day for hearing the same, and shall cause notice thereof containing the substance of the complaint to be served upon the railroad company, common carrier, or other person or persons hereinbefore named complaining, and

the railway, company or common carrier complained of, and the day and date upon which hearing will be had upon the complaint; * * *."

Also, section 75-405, R. R. S. 1943, provides that any person who shall be dissatisfied with the decision of the Nebraska State Railway Commission affirming, revising, annulling, or modifying any rate or rates complained of in the original schedule or any subsequent schedule, or with the decision of the commission with reference to any rate, classification, rule, charge, order, act, or regulation made or adopted by the commission, may institute proceedings in this court to reverse, vacate, or modify the order complained of, if such person has been affected by the decision of the commission.

We turn then to the question whether orders of the commission here involved were void for failure to comply with sections 84-901 to 84-908, R. R. S. 1943, which allegedly required publication of notice and a public hearing on defendant's application, and that in any event the rules adopted or amended would be invalid and ineffective unless approved by the Attorney General and filed with the Secretary of State, which admittedly was not done. In that connection, plaintiff relies upon Mogis v. Lyman-Richey Sand & Gravel Corp., 90 F. Supp. 251, which was affirmed in 189 F. 2d 130 by the United States Court of Appeals. Those opinions involved a controversy which arose and was instituted under the aforesaid statutes as they existed prior to the time section 84-901, R. R. S. 1943, was amended by Laws of Nebraska, 1951, Chapter 342, section 1, page 1128, known as L. B. 241, which was evidently done for the purpose of making such decisions no longer controlling. See, Statement of Government Committee, In re L. B. 241, dated March 7, 1951.

As so amended, section 84-901, R. R. S. 1943, effective August 27, 1951, provided in part: "(2) 'rule' means the written statement of any rule, regulation, standard or policy of general application issued by an agency,

including the amendment or repeal thereof, and designed to implement, interpret, or make specific the law enforced or administered by it, or governing its organization or procedure, but not including regulations concerning the internal management of the agency not affecting private rights or interests, *and not including rate tariffs, and any rules of interpretation thereof; * * *.*" (Italics supplied.) The italicized language aforesaid was the amendment added to the act in 1951. The aforesaid section was again amended in 1959, effective September 28, 1959, to make crystal clear what the Legislature intended by the 1951 amendment. See § 84-901, R. S. Supp., 1959. As amended in 1951, "rate tariffs, and any rules of interpretation thereof" are rules and regulations of general application which deal with and fix schedules and classifications of rates and charges. See, Mogis v. Lyman-Richey Sand & Gravel Corp., 189 F. 2d 130; Union Wire Rope Corp. v. Atchison, T. & S. F. Ry. Co., 66 F. 2d 965.

Contrary to plaintiff's contention, we find no legal distinction between rate tariffs and rate orders. Such rules and regulations and any rules of interpretation thereof are not included in section 84-901, R. R. S. 1943. Also, contrary to plaintiff's contention, sections 84-907 and 84-908, R. R. S. 1943, enacted in 1953, and effective March 24, 1953, which are in pari materia with section 84-901, R. R. S. 1943, and deal with rules adopted, amended, or repealed by any state agency, likewise do not include or have application to "rate tariffs, and any rules of interpretation thereof" by the commission, which are clearly excepted and not included in said sections.

In Nebraska Limestone Producers Assn. v. All Nebraska Railroads, 168 Neb. 786, 97 N. W. 2d 331, we reaffirmed that: "The power of the State Railway Commission to fix the rates to be charged by common carriers is legislative and not judicial in character."

Plaintiff not only had notice of defendant's pending application but it also enacted an occupation tax on the

same day after defendant's application had been granted. Thereafter, plaintiff accepted payment of the occupation tax from defendant on April 27, 1959, and, with plaintiff's knowledge, defendant billed subscribers within the city pro rata therefor from May 1959, until September 30, 1959, before plaintiff instituted this action, although plaintiff admittedly knew on April 25, 1959, that such billing had been authorized by the commission and would be made. Be that as it may, we conclude, under the circumstances presented herein, that no notice to plaintiff was required to be given by the commission before it acted legislatively in permitting defendant to revise and amend its rate rules and regulations to permit it to collect pro rata from its subscribers within the city the occupation tax imposed by the city unless a statute specifically required notice. We have not been cited and we have not found such an applicable and controlling statute in situations comparable with that at bar.

As far as important here, section 75-201, R. R. S. 1943, provides in part: "The State Railway Commission shall have the power to regulate the rates and services of, and to exercise a general control over, all * * * telephone * * * companies, and any other carrier engaged in the * * * transmission of messages for hire." See, also, § 75-245, R. R. S. 1943; Art. IV, § 20, Constitution of Nebraska. As we view it, such cited and quoted sections and sections 75-302, 75-401, 75-402, 75-403, 75-404, and 75-405, R. R. S. 1943, have application and are controlling here. Thereby, plaintiff and other subscribers and common carriers as well were timely given ample notice and just protection of all their rights. As a matter of fact, the pleadings filed in this action were amply sufficient to bring the issues and procedure squarely within such provisions.

Finally, we turn to the issue of whether the commission had the power to enter orders as such permitting defendant to amend and revise its rules and

regulations and thereby pass the occupation tax imposed by plaintiff on to its subscribers within the city pro rata and whether such orders were unreasonable or were discriminatory in the light of section 75-501, R. R. S. 1943.

With regard to the question of the commission's power to render such orders, plaintiff cites and relies upon State ex rel. City of St. Louis v. Public Service Commission, 362 Mo. 977, 245 S. W. 2d 851, 93 P. U. R. N. S. 454, in support of its contention that such power did not exist. Plaintiff admits that such Missouri opinion was subsequently overruled in State ex rel. City of West Plains v. Public Service Commission (Mo.), 310 S. W. 2d 925, 23 P. U. R. 3d 164. However, plaintiff argues that we should follow a dissenting opinion filed therein which we do not find supported by any other authority. In that majority opinion, the Missouri court said: "We are of the view, therefore, that the commission, as a part of its power and duty to establish reasonable rates which would produce a fair return, could lawfully provide for and prescribe the reguations and practices to be indulged by the utility to produce the desired result, including the power to permit Western to file a general rule with its rate schedule authorizing that utility to pass on license and occupation taxes to certain subscribers." No authority cited or found holds otherwise. Such conclusions are ably supported by authorities from other jurisdictions.

In City of Newport News v. The Chesapeake & Potomac Telephone Company of Virginia, 198 Va. 645, 96 S. E. 2d 145, 17 P. U. R. 3d 284, the court said: "The power of the Commission to enter an order of the kind involved on this appeal seems clear. * * * The Commission stated in the conclusion of its opinion that the charges authorized by its order to be added to the bills of the company's local customers 'place the added burden on those who should bear it and prevent each locality from upsetting the state-wide system of rate-making

for its own advantage and to the disadvantage of consumers living outside the taxing locality.' It is within the constitutional and statutory powers of the Commission to accomplish that result."

In State ex rel. Pacific Tel. & Tel. Co. v. Department of Public Service, 19 Wash. 2d 200, 142 P. 2d 498, 52 P. U. R. N. S. 6, as interpreted and clarified by State ex rel. City of Seattle v. Department of Public Utilities, 33 Wash. 2d 896, 207 P. 2d 712, the Washington Supreme Court in this particular opinion was reviewing and upholding the opinion and order of the Department of Public Service, which appears in 37 P. U. R. N. S. at page 321, as follows: "By Advice No. 392, filed June 22, 1938, the company sought to pass on to its subscribers municipal occupational license taxes within seven cities which now levy such taxes. * * *

"The company maintains that the failure to pass on this tax pro rata to the subscribers in the cities in which it is levied, inevitably creates a situation prejudicial and unjustly discriminatory in respect to subscribers in areas in which no such taxes are levied.

"It would be manifestly unfair to impose upon the many thousands of telephone subscribers in this state, who live elsewhere than in the seven cities in which such taxes are now levied, the burden of providing the dollars necessary to pay occupation taxes in those cities. (It is no answer to say that the company should itself pay this tax, for the company must necessarily pay it out of dollars received from its subscribers. In our opinion, it is much more equitable to provide that the subscribers in the various cities should assume that responsibility, if such cities have used that method of providing additional tax revenue, than to require subscribers throughout the state to help carry the cost of paying the taxes exacted by these particular cities. There can be no doubt that an unjust and unreasonably discriminatory situation now exists in respect to these particular taxes, and that this burden must be

placed where it should be, namely, upon the subscribers in the particular localities in which the taxes are levied.)

"Two methods have been suggested for accomplishing this end, one being to fix special exchange rates in the several localities in question sufficient to allow for these taxes under operating expenses, and the other to allow the pro rata passing on of the tax itself to the subscribers in the taxing localities, as proposed by the company.

"The second suggestion is more equitable. It has the advantage of immediately imposing upon ratepayers in any community which elects to derive revenue from such a tax, the burden of providing those dollars. Conversely, whenever any such tax is repealed by any of the levying cities, the subscribers in question will be relieved automatically and concurrently of the burden which has been imposed upon them by their own municipalities.

"An additional reason for this conclusion is that if we countenance the recurrent imposition of similar taxes by the host of municipalities in this state upon the various utilities subject to our jurisdiction, the inevitable result will be, as in this case, continually mounting operating expenses over which we can exercise no control. This may well lead to a procession of rate cases requiring the expenditure of much time and expense both by the utilities and by the Department.

"We, therefore, direct the company to pass on municipal occupation taxes."

In that connection, we point out that the opinion, findings, and decision of the commission in the case at bar contain an almost verbatim adoption of the above quotation about which the opinion of the Supreme Court of Washington said: "We are convinced that the Department, insofar as such taxes are concerned, has the power to fix special exchange rates applicable to the different communities, which will in

effect require the ratepayers in each community to absorb a sum equal to the amount of the tax which respondent is required to pay to that municipality. More than this, the Department cannot do." State ex rel. Pacific Tel. & Tel. Co. v. Department of Public Service, *supra.*

Also, in a second opinion, in that case, wherein the cities again appealed, contending that the lower court had misconstrued the Supreme Court's opinion, the Washington Supreme Court said: "The questions were all considered by the superior court when it reviewed the department's order. This court in its opinion examined the questions relating to all the taxes. The superior court entered its judgment on the remittitur, and included therein the following:

" 'The Department may order the Relator to pass on to the subscribers in any municipality any * * * occupation taxes * * *.'

"When this court denied the petition for recall of remittitur and correction of the judgment, it in effect approved the judgment entered by the superior court." State ex rel. City of Seattle v. Department of Public Utilities, *supra.*

In City of Elmhurst v. Western United Gas & Electric Co., 363 Ill. 144, 1 N. E. 2d 489, the court said: "The discrimination forbidden by paragraph 53 (sec. 38) is as to rates between customers of the same class in the territory. Customers residing in subdivisions of the same territory served by the public utility where an annual percentage of its gross receipts is exacted from the public utility, are not in the same class as those patrons who live in a municipality where such percentage is not exacted. * * * It would be unjust to spread the burden of this annual franchise payment over the whole northern division. It should be borne by the company's consumers residing within the city as that city alone receives the advantage of such annual payment. So, also, it is immaterial in what form the pro rata share

of the consumers' payment of the annual payment be made to the city. There is no statute in this State prescribing the method of allocating such item and it may properly be written on the consumer's statement as three percent." The statute referred to therein is comparable with section 75-501, R. R. S. 1943. See, also, Ogden City v. Public Service Commission, 123 Utah 437, 260 P. 2d 751, 2 P. U. R. 3d 521; Ogden City v. Public Service Commission, 123 Utah 443, 260 P. 2d 754, 2 P. U. R. 3d 525.

Other authorities from utility commissions in Alabama, Arkansas, California, Colorado, Idaho, Kansas, Missouri, West Virginia, and Wyoming, too numerous to cite here, uphold the power and authority of the commission to pass such character of taxes on to subscribers within the limitations of the city pro rata and that such orders are not discriminatory or unreasonable.

In Nebraska Limestone Producers Assn. v. All Nebraska Railroads, *supra,* we held that: "On appeal from a decision of the State Railway Commission involving the rates to be charged by common carriers it is presumed that the rates prescribed are just, reasonable, and not arbitrary, and are otherwise lawful.

"Under the statutes of this state it is only unjust discriminations and undue preferences under substantially similar circumstances and conditions which are unlawful and prohibited.

"On appeal from a decision of the State Railway Commission the only questions to be determined are whether or not the commission acted within the scope of its powers and whether or not the order complained of is reasonable and not arbitrarily made.

"Where there is substantial evidence supporting factors by which rates of common carriers are fixed which are in conflict with other recognized factors, the power to resolve such conflicts ordinarily rests with the commission and not the courts.

"Where it is shown that an order of the State Rail-

way Commission is within the scope of the powers vested in it, and such order is not unreasonable, arbitrary, or prohibited, and is supported by competent and relevant evidence, the courts have no authority to interfere with the judgment of the commission."

In the light of the evidence which will not support a finding that the commission's orders here involved were arbitrary and unreasonable, and in the light of the aforesaid authorities, we conclude that plaintiff as a subscriber had a right to maintain the action at bar before the commission and appeal to this court; that the orders of the commission entered January 26, 1959, and April 21, 1959, were not void for failure to comply with sections 84-901 to 84-908, R. R. S. 1943; that the commission had legislative power and authority to render the orders involved; that plaintiff and other subscribers and common carriers as well were given ample notice and just protection of all their rights by statutes heretofore cited; and that the commission's orders were not discriminatory, unreasonable, or arbitrary. For reasons heretofore stated, the decision of the commission dismissing plaintiff's complaint should be and hereby is affirmed.

AFFIRMED.